# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### November 6, 2019 Session

## STATE OF TENNESSEE v. ANTONIO BENSON

**Appeal by Permission from the Court of Criminal Appeals
Criminal Court for Shelby County
No. 13-04060       Lee V. Coffee, Judge**

_____

### No. W2017-01119-SC-R11-CD

_____

The defendant, Antonio Benson, was convicted of first-degree premeditated murder and sentenced to life in prison. On appeal, the defendant contended that the proof at trial fairly raised the issue of whether or not he killed the victim in self-defense and that the trial court erred in refusing to instruct the jury on self-defense. The Court of Criminal Appeals agreed that self-defense should have been charged and concluded that the error was not harmless. The intermediate court therefore reversed the defendant's conviction and remanded the case for a new trial. We granted this appeal to clarify the gatekeeping function of a trial court when assessing whether self-defense has been fairly raised by the proof and to consider the quantum of proof necessary for a court to charge a jury on self-defense. We hold that self-defense was not fairly raised by the proof in this case because the defendant was not lawfully defending himself when he killed the victim. We, therefore, reverse the judgment of the Court of Criminal Appeals.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal
Appeals Reversed; Judgment of the Trial Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the Court, in which JEFFREY S. BIVINS, C.J., and CORNELIA A. CLARK, SHARON G. LEE, and HOLLY KIRBY, JJ., joined.

Herbert H. Slatery III, Attorney General and Reporter; Andrée Sophia Blumstein, Solicitor General; Jonathan David Shaub, Assistant Solicitor General; Amy P. Weirich, District Attorney General; and Karen Cook and Stacy McEndree, Assistant District Attorneys General, for the appellant, the State of Tennessee.

David Mays, Memphis, Tennessee, for the appellee, Antonio Benson.

1

## OPINION

### I.    FACTS AND PROCEDURAL HISTORY

On May 31, 2013, defendant Antonio Benson shot and killed the victim, Amy Hallmon. At the time she was killed, the victim was approximately twenty-three years old and the mother of three young children. The children were living with the victim's family members due to her drug problem. On the night of the murder, the victim was at her boyfriend's duplex in Shelby County. A man named Kevin Williams lived in the other half of the duplex, and the defendant, who lived across the street, was visiting Mr. Williams. At some point during the evening, the defendant went to the opposite side of the duplex and asked the victim to come to Mr. Williams' house with him. The victim obliged and brought a black bag with some of her belongings with her.

Mr. Williams testified at the defendant's trial. According to Mr. Williams, the defendant, Mr. Williams, and the victim all socialized at Mr. Williams' home. The defendant drank a beer while Mr. Williams and the victim smoked marijuana. Mr. Williams relayed that during the evening, the victim, a petite woman, bent over to get something out of her black bag, at which time the defendant walked up to her and asked her to perform oral sex on him. Mr. Williams stated that the victim refused, and the defendant grabbed the back of the victim's head. The victim told the defendant "I'm not playing with you" and the defendant backed away. The victim then returned to her bag to attempt to retrieve something, and the defendant again demanded oral sex from her. The victim again refused. Mr. Williams testified that he then told the defendant to stop and to leave the victim alone. However, the scene played out again for a third time. At this point, the victim told the defendant she was going to "knock [his] b**** ass out." The victim then swung at the defendant and missed. She swung again punching the defendant in the nose causing him to bleed. The victim then continued to verbally taunt the defendant, saying "Yeah, b****, what you think I told you, whoo, whoo, whoo, whoo." Mr. Williams testified that the defendant then said to the victim "B****, you made me bleed" and pulled a handgun out of his back pocket, pointing it upward. Per Mr. Williams' testimony, the defendant then turned to Mr. Williams and asked "Hey, Cous, man, you think I should shoot that b****?" Mr. Williams replied "Hell, no, fool, she told you to quit messing with her." The defendant chose not to heed this warning, and he told the victim "B****, I feel sorry for your kids" before shooting the victim at least five times, including shooting her twice in the back.

Mr. Williams testified that, after shooting the victim, the defendant said "B****, you better not bleed on my n***** floor" and dragged the victim outside while she was still alive and conscious. During this time the victim asked the defendant "Why you do this to me? Why you do that? You hurt me. You didn't even have to shoot me." The defendant then came back into the house without the victim, and he had blood on his

2

face, shirt, and arm. Mr. Williams described the defendant as "raging." At that point, Mr. Williams stated that he was frightened and fled through the front door of the house.

The victim's body was discovered by a neighbor early the following morning. According to witnesses who worked the crime scene, the victim was found deceased in the back yard of Mr. Williams' house by a fence. Her left hand was hooked to the fence like she was holding onto it when she died. In addition to the gunshot wounds, the victim was found to have multiple other abrasions and contusions on her body. She appeared to have been dragged to the place by the fence.

Later that morning, the defendant gave a statement to the police detailing his version of the events that led to the victim's death. The defendant did not testify at trial, but his statement to police was admitted into evidence at trial. In his statement, the defendant admitted that he shot the victim because they were arguing. He said the argument started because the victim demanded drugs from him and got upset when he would not give her any drugs. According to the defendant's statement, the following events then transpired:

> [The victim] got upset cause I wouldn't give her what she was looking for or whatever. So we got into an argument and she swung and tried to hit me the first time and she didn't hit me. Then she swung a second time and she hit me in the nose. I had the gun in my hand and I pulled it out from my pocket and I pulled the trigger and shot her. I think I shot her twice. We were still arguing, she was still trying to fight over there so we went behind the house still arguing. I shot her again when we were tussling on the ground and I was on top of her. I left and I walked on Thomas and got in a car with my cousin.

When asked what he meant when he said he would not give the victim what she was looking for, the defendant said the victim was wanting drugs. The defendant further relayed to the police that he disposed of the gun used in the altercation in a garbage can wrapped in a bag. When asked how many shots he fired at the victim, the defendant answered, "Four that I can remember."

Mr. Williams was also interviewed by the police on the morning the victim's body was found. In his initial statement to police, Mr. Williams identified the defendant as the one who shot the victim, but Mr. Williams said at that time he did not know why the defendant and the victim had been arguing.

The defendant was charged in the indictment with "Murder First Degree" for "unlawfully, intentionally, and with premeditation kill[ing] AMY M. HALLMON, in violation of T.C.A. 39-13-302." At the trial, the State presented several witnesses and introduced more than seventy exhibits. The only eye witness to the murder was Mr.

3

Williams. He acknowledged that in his first statement to police, he left out the part about the defendant demanding sexual favors from the victim, the defendant asking him if he should shoot the victim, and the defendant telling the victim he felt sorry for her kids before he shot her. However, Sergeant Kevin Lundy, who interviewed Mr. Williams the morning after the shooting, testified that Mr. Williams was very upset while giving his statement, even crying and shaking.[1] He stated that, in his experience, it would not be unusual for someone in Mr. Williams' position to forget to mention certain things in his statement to police.

According to Dr. Marco Ross, the Chief Medical Examiner for West Tennessee Regional Forensic Center who performed the victim's autopsy, the cause of death was multiple gunshot wounds. She had one gunshot wound to her left cheek, one to her upper chest, one to her right shoulder, and two to the left side of her back. Although the gunshot wounds to the victim's chest and back were fatal, her death was not instantaneous. She most likely lived for less than fifteen minutes, but it could have taken up to an hour for her to die. The victim was five feet, two inches tall and weighed one hundred twenty-seven pounds. Dr. Ross acknowledged that toxicology results showed the following drugs in the victim's blood: amphetamine; methamphetamine; 7-aminoclonazepam, a breakdown product of clonazepam; alprazolam, also known as Xanax; cocaine; and benzoylecgonine, a breakdown product of cocaine. Dr. Ross testified that these substances did not contribute to the victim's death. During cross-examination of Dr. Ross, defense counsel attempted to show that this degree of drug intoxication would have made the victim dangerous enough to justify the defendant using deadly force against her during their argument. Of particular interest was that the victim had a level of seven hundred nanograms per millimeter of methamphetamine in her system, which is a notably high amount even for regular users of the drug. Although Dr. Ross acknowledged that these drugs could cause agitation, aggressiveness, anxiety, paranoia, and hallucinations, he could not say how these drugs would have affected the victim personally because it would depend in large part on her tolerance to them.

After the State's proof, counsel for the defendant moved for judgment of acquittal, which the trial court denied. At that time, the defense also submitted that there was already a basis to justify giving a self-defense instruction to the jury. Defense counsel asserted that the State's proof showed that the victim had been the first aggressor, which caused a chain reaction leading to her being shot. The State, however, argued that simply because the victim may have been the first one to throw a punch did not necessarily justify the defendant shooting her five times. The trial court agreed with the State, finding that to use deadly force against the victim, the defendant must have had a reasonable belief of death or serious bodily injury caused by the victim. Regarding the allegation that the victim was the first aggressor, the trial court noted that Tennessee case

---

[1] Sergeant Lundy was the case officer assigned to the victim's homicide in 2013 but was retired from the Memphis Police Department by the time of trial.

4

law generally holds that self-defense is not available to a defendant who provoked or consented to the danger. The trial court found that, even taking the defendant's statement to the police as wholly true, there was no question that the victim was unarmed at the time she was killed, and there was no indication that the victim ever threatened or attempted to use unlawful deadly force against the defendant or caused or threatened to cause serious bodily injury to the defendant. The trial court further concluded that getting punched in the nose is not "serious bodily injury." Therefore, the trial court denied the defendant's motion to submit a self-defense instruction to the jury by finding that self-defense had not yet been "fairly raised" by the proof.

The defense called only one witness, Ms. Lady Jordan, who was one of Mr. Williams' neighbors on the night the victim was killed. Ms. Jordan testified that she heard commotion and gunshots that night. She said she then looked out of her window and saw several people at Mr. Williams' house, including someone who was not the defendant loading things into a car. She also saw the defendant trip and fall while stumbling across the street to his mother's house. During her testimony at trial, Ms. Jordan was asked to identify the defendant. Upon seeing the defendant in open court Ms. Jordan asked "What happened to your face?" Ms. Jordan stated that the defendant's nose was different than she remembered and "messed up" now but admitted she did not know what caused the change in his nose, whether it was due to his fall while crossing the street, being punched by the victim, or otherwise.

After Ms. Jordan's testimony, defense counsel informed the court that it rested its proof and notified the court that the defense had now filed a formal written request for a self-defense instruction. Defense counsel argued that he believed that Ms. Jordan's testimony established the "disfigurement" of the defendant's nose due to the victim punching him, and that this brought the defendant within his right to use deadly force against the victim to defend himself. The trial court again denied the defendant's motion, stating that Ms. Jordan testified she did not know when or how the defendant hurt his nose. It could have happened when he fell face first on the sidewalk that night on his way to his mother's house, or it could have even happened once he got to jail. The court again found that the defendant did not sustain a serious bodily injury and that even if the problem with his nose had been caused by the victim's punch, it still did not amount to "serious bodily injury" that would allow the deadly force to be used as a defense.

In accordance with this ruling, the trial court then gave final instructions to the jury and did not include any charge related to whether the defendant acted in self-defense. Nevertheless, in his closing argument, counsel for the State told the jury that "this is not a self-defense case" because "[i]f it were a self-defense case, you'd have an instruction on that." After deliberation, the jury found the defendant guilty of first-degree

5

premeditated murder, and the trial court sentenced him to life in prison.[2] The defendant subsequently filed a motion for a new trial, with the first issue being the trial court's refusal to give a self-defense instruction. The trial court denied the defendant's motion and, regarding the issue of self-defense, incorporated by reference the findings made by the court at the time the defense initially requested a self-defense instruction.

The Court of Criminal Appeals reversed, holding that the trial court erred by failing to instruct the jury on self-defense and that the error was not harmless. *State v. Benson*, No. W2017-01119-CCA-R3-CD, 2018 WL 5810004, at *14 (Tenn. Crim. App. Nov. 5, 2018), *perm. app. granted* (Tenn. Apr. 12, 2019). The intermediate court determined that the issue of self-defense was fairly raised by the proof in this case and that the trial court should have allowed the jury to decide the reasonableness of the defendant's belief that he was in imminent danger and whether he used appropriate force. *Id.* at *8. Regarding the evidence it found to have "fairly raised" self-defense, the Court of Criminal Appeals stated:

> Defense counsel raised the issue of self-defense in his opening statement, saying that the victim "was the perpetrator of a violent attack against [the defendant], making him react, making him defend himself." During the trial, the proof was uncontroverted that the victim hit the [defendant] in the nose before he shot her. Even the prosecutor appeared to recognize that self-defense had been fairly raised by the evidence, warning the jury during his closing argument that the jury could not consider self-defense[.]

*State v. Benson*, 2018 WL 5810004, at *9. The intermediate court also highlighted the "perplexing" note from a juror about self-defense, *see supra* note 2, before concluding that it must reverse the defendant's conviction and remand the case for a new trial due to the trial court's failure to instruct the jury on self-defense. *Id.*

We granted the State's application for permission to appeal to address whether self-defense should have been charged to the jury under these circumstances and to clarify the role of the trial court in making that determination.

## II.    ANALYSIS

---

[2] While the jury was deliberating, the court received a note submitted by a juror that read, "Is it ever okay to shoot someone in the back in any situation? Rather it's self-defense, someone breaking in your house, etc." However, before the trial court had the opportunity to address the question, the jury informed the court that they no longer needed the question answered and were in the process of writing their verdict. The trial court put the note in the record, and the jury returned a verdict without any further discussion of the note.

## A.    Standard of Review

Questions involving the propriety of jury instructions are mixed questions of law and fact. *State v. Cole-Pugh*, 588 S.W.3d 254, 259-60 (Tenn. 2019) (citing *State v. Perrier*, 536 S.W.3d 388, 396 (Tenn. 2017)). Accordingly, our standard of review is *de novo* with no presumption of correctness. *Id.*

Defendants have a constitutional right to complete and accurate jury instructions on the law. *Cole-Pugh*, 588 S.W.3d at 260. The failure to properly administer jury instructions can deprive a defendant of his constitutional right to a jury trial. *Id.* In criminal cases, a trial court's duty to accurately instruct the jury on relevant legal principles exists without request. *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013) (citing *State v. Dorantes*, 331 S.W.3d 370, 390 (Tenn. 2011)); *see also Cole-Pugh*, 588 S.W.3d at 260. Further, a "'defendant has a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury upon proper instructions by the judge.'" *State v. Sims*, 45 S.W.3d 1, 9 (Tenn. 2001) (quoting *State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975)). If a trial court refuses to charge a jury with a special instruction, it will only be considered error if the general charge did not fully and fairly state the applicable law. *Hawkins*, 406 S.W.3d at 129 (citations omitted); *see also Perrier*, 536 S.W.3d at 403 (quoting *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005)) ("'An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law.'").

A statute provides that trial courts need not submit "[t]he issue of the existence of a defense . . . to the jury unless it is fairly raised by the proof." Tenn. Code Ann. § 39-11-203(c) (2018); *Hawkins*, 406 S.W.3d at 129. This statute was enacted as part of the 1989 Criminal Sentencing Reform Act and has not been amended since its enactment. Therefore, the Sentencing Commission Comments remain applicable and state that under this statute, "[t]he defendant has the burden of introducing admissible evidence that a defense is applicable." Tenn. Code Ann. § 39-11-203, Cmts. of the Tenn. Sentencing Comm'n. According to *Hawkins*, self-defense is a general defense and "the quantum of proof necessary to fairly raise a general defense is [something] less than [what is] required to establish a proposition by a preponderance of the evidence." *Hawkins*, 406 S.W.3d at 129. When determining if a defense has been fairly raised by the proof, the court must consider the evidence in the light most favorable to the defendant, including all reasonable inferences that can be made in the defendant's favor. *Id.* If a general defense is found to be fairly raised by the proof, the trial court must submit the defense to the jury and the burden shifts to the prosecution to prove beyond a reasonable doubt that the defense does not apply. *Perrier*, 536 S.W.3d at 403.

## B.    Self-Defense

7

At trial, the defendant in this case claimed that his killing of the victim was justified because he was acting in self-defense. Tennessee Code Annotated section 39-11-611(b) provides the statutory basis for this defense:

(b)(1) Notwithstanding § 39-17-1322,[3] a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.

(2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

(A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;[4]

(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(b).

## C.    Trial Court's Role as Gatekeeper

This case presents the opportunity to further consider the role of a trial court as gatekeeper. We have recently reviewed related issues in *State v. Perrier*, 536 S.W.3d 388 (Tenn. 2017), and *State v. Cole-Pugh*, 588 S.W.3d 254 (Tenn. 2019); however, it appears that the gatekeeping role of the trial court when assessing whether a defense has been fairly raised by the proof and thus should be charged to the jury needs additional clarification.

---

[3] Tennessee Code Annotated section 39-17-1322 provides a defense to prosecution for weapons violations under Part 13 when a person used a handgun in justifiable self-defense.

[4] "Serious bodily injury" is defined as "bodily injury that involves: (A) A substantial risk of death; (B) Protracted unconsciousness; (C) Extreme physical pain; (D) Protracted or obvious disfigurement; (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty; or (F) A broken bone of a child who is twelve (12) years of age or less." Tenn. Code Ann. § 39-11-106(a)(36)(A)-(F).

In *State v. Perrier*, this Court addressed the question of whether the trial court or the jury should make the threshold determination of whether or not a defendant was engaged in unlawful activity for purposes of the retreat component of the self-defense statute, Tennessee Code Annotated section 39-11-611. *Perrier*, 536 S.W.3d at 394. We held that the trial court, not the jury, should determine whether the State's proof established clear and convincing evidence that the defendant was engaged in unlawful activity when he used force in an alleged self-defense situation. *Id.* at 403. We held that the trial court's jury instruction was, therefore, improper because the instructions left the determination of unlawful activity to the jury. *Id.* at 403-04.

Subsequently, in *State v. Cole-Pugh*, this Court considered the proper role of the trial judge in instructing on the defense of necessity. *Cole-Pugh*, 588 S.W.3d at 259. We concluded that the trial court should make the decision as to when the defense is fairly raised by the evidence. If the defense is fairly raised, the trial court is obligated to instruct the jury accordingly, regardless of whether the defendant makes a written request. *Id.* at 263-64. We further concluded that a defendant need not testify that he reasonably feared imminent bodily harm. *Id.* at 263. The trial court may draw such an inference from the evidence as it is viewed in the light most favorable to the defendant. *Id.* Considering these precedents, we now conclude that it is the role of the trial court to make a threshold determination of whether self-defense has been fairly raised by the evidence and thus should be submitted to the jury.

### D. Proof Necessary to "Fairly Raise" Self-Defense

Here, the State urges this Court to clarify the quantum of proof necessary to "fairly raise" self-defense. The State proposes that this Court adopt a standard that would require a judge to submit a general defense to the jury only if a "reasonable juror" could find in the defendant's favor. Our Court of Criminal Appeals utilized a similar standard in *State v. Bult*, 989 S.W.2d 730, 733 (Tenn. Crim. App. 1998).[5] To the contrary, the defendant proposes that this Court adopt an approach that would consider self-defense "fairly raised" if a defendant can point to even "the slightest evidence" of self-defense. According to the defendant, the question of whether a defendant acted in self-defense "should not be a judicial determination even if there is the *slightest of evidence* of self-defense." The defendant contends that this Court's decisions in *State v. Buggs*, 995

---

[5] The *Bult* court stated that "[a] defendant is entitled to the issue of the existence of a defense being submitted to a jury when it is fairly raised by the proof" and that a jury instruction was not required where "no rational juror could have a reasonable doubt based upon the claim." *Bult*, 989 S.W.2d at 733. This measure of proof is similar to the standard employed by a trial judge when determining whether to grant a motion for judgment of acquittal pursuant to Rule 29(b) of the Tennessee Rule of Criminal Procedure and is also analogous to the amount of proof required for a trial court to instruct a jury on a lesser included offense. *See* Tenn. Code Ann. § 40-18-110(a) (stating that a "trial judge shall not instruct the jury as to any lesser included offense unless the judge determines that the record contains any evidence which reasonable minds could accept as to the lesser included offense").

S.W.2d 102 (Tenn. 1999), and *Liakas v. State*, 286 S.W.2d 856 (Tenn. 1956), support the "slightest of evidence" standard. However, neither *Buggs* nor *Liakas* discuss the level of proof required to "fairly raise" self-defense, nor do they otherwise support the defendant's position. Regardless, we reject this minimal standard proposed by the defendant and find that more than the "slightest of evidence" is necessary to fairly raise self-defense.

Although the phrase "fairly raised" is not defined by statute, it has been the standard relevant to raising a general defense in Tennessee for decades. In *Hawkins*, this Court held:

> A general defense . . . need not be submitted to the jury unless it is "fairly raised by the proof." Tenn. Code Ann. § 39-11-203(c) (2010). The quantum of proof necessary to fairly raise a general defense[6] is less than that required to establish a proposition by a preponderance of the evidence. To determine whether a general defense has been fairly raised by the proof, a court must consider the evidence in the light most favorable to the defendant and draw all reasonable inferences in the defendant's favor. Whenever admissible evidence fairly raises a general defense, the trial court is required to submit the general defense to the jury. From that point, the burden shifts to the prosecution to prove beyond a reasonable doubt that the defense does not apply.

*Hawkins*, 406 S.W.3d at 129 (citing *State v. Bledsoe,* 226 S.W.3d 349, 355 (Tenn. 2007)). Even before *Hawkins,* this Court stated that a defendant is entitled to a jury instruction on duress "only if it is fairly raised by the proof. Because duress is a general rather than an affirmative defense, a criminal defendant need not establish the elements of duress by a preponderance of the evidence in order to merit a jury instruction." *State v. Hatcher*, 310 S.W.3d 788, 816-17 (Tenn. 2010) (citations omitted) (internal quotation marks omitted); *see also Bledsoe*, 226 S.W.3d at 355; *State v. Culp*, 900 S.W.2d 707, 709-10 (Tenn. Crim. App. 1994). Furthermore, sixteen years before the 1989 Criminal Sentencing Reform Act was adopted, the Tennessee Court of Criminal Appeals stated as follows concerning an alibi defense:

> Finally, he contends the trial court erred in not charging the law on alibi. It is true, as urged by the state, no special request was submitted for the court to charge on alibi. *However, if the issue is fairly raised by the evidence it is mandatory for the court to so charge. See Poe v. State*, 212 Tenn. 413, 416, 370 S.W.2d 488. Here the defendant testified and denied breaking

---

[6] "Conversely, affirmative defenses require pre-trial notice by the defense and, once fairly raised, must be proven by the *defendant* by a preponderance of the evidence." *Cole-Pugh*, 588 S.W.3d at 260 (citation omitted).

into the garage and further denied ever being with Neal and Qualls when they broke into any premises. Although the record is not too clear, his testimony indicates he was not in the county at the time but was in Nashville. Further, his mother related that every night that he was in Rhea County he was home with her and stayed there all night. We feel this testimony fairly raised the issue, placing the duty upon the trial court to affirmatively charge this jury the law on alibi under the holdings of *Poe v. State*, supra. This was prejudicial error requiring reversal of this conviction. The assignment is accordingly sustained with the result that the judgment of the trial court is reversed and the record remanded for a new trial.

*Sneed v. State*, 498 S.W.2d 626, 629 (Tenn. Crim. App. 1973) (emphasis added).

With the statute and *Hawkins* in mind, we turn to the case at hand, in which the trial court determined that a punch in the nose was not serious bodily injury within the meaning of the self-defense statute and that nothing in the record showed that the victim used or attempted to use deadly force against the defendant or threatened to cause serious bodily injury to the defendant. While the Court of Criminal Appeals did not clearly articulate the standard it employed, the intermediate court disagreed with the trial court's assessment that the defense had not been fairly raised by the proof and determined that the question of whether the victim's actions caused the defendant to have a reasonable fear of death or serious bodily injury was for the jury to decide. *Benson*, 2018 WL 5810004, at *7.

On appeal, the defendant asserts that the evidence viewed in the light most favorable to the defendant and drawing all reasonable inferences in favor of the defendant shows that the victim was "high on drugs, seeking more drugs, was the first aggressor in

11

a violent and sudden attack, with enough force to disfigure the defendant's face,[7] was unfazed by initial shots, and continued the fight from inside the house to outside the house." We note, however, that there was nothing in the defendant's own statement to the police to fairly raise the issue that he feared imminent death or serious bodily injury.

Further, the defendant's position conflates the ability to use force generally with the use of deadly force. This distinction is crucial to determining whether self-defense has been "fairly raised" in a murder case such as this. The bar is substantially higher for one trying to fairly raise the issue of the valid use of deadly force:

> (b)(2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using *force intended or likely to cause death or serious bodily injury, if*:

> (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

> (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

> (C) The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(b)(2) (emphasis added). At most, the defense proof fairly raised the issue of whether the defendant was justified in using *non-lethal* force to protect himself from the victim. The defendant here, however, is not attempting to justify a simple assault against the victim. Instead, he chose to respond to a punch in the nose by pulling out a gun and shooting a small, unarmed woman five times, including twice in the

---

[7] In an attempt to justify his use of deadly force, the defendant asserts that he did in fact sustain "serious bodily injury" as a result of the victim's punch. To that end, the defendant argues that his "displaced nose" constitutes "disfigurement," which falls within the definition of "serious bodily injury." However, as the trial court aptly noted, there was no evidence at trial to show that the victim's punch was the cause of the defendant's displaced nose. The only proof of the nature of the defendant's injury is that the punch caused his nose to bleed. This fact is insufficient to support defendant's claim of "disfigurement" or "serious bodily injury" that would justify responding with deadly force. Furthermore, the statutory definition of "serious bodily injury" includes "bodily injury that involves . . . *[p]rotracted* or *obvious* disfigurement." Tenn. Code Ann. § 39-11-106(a)(36)(D) (emphasis added); *see also State v. Sims*, 909 S.W.2d 46, 49 (Tenn. Crim. App. 1995). Ms. Lady Jordan's testimony that the defendant's nose was different than she remembered or "messed up" was simply not enough to allow the question of "serious bodily injury" to be submitted to jury. *See, e.g.*, *State v. Farmer*, 380 S.W.3d 96, 100-03 (Tenn. 2012) (holding that a gunshot wound that passed through a robbery victim's leg did not constitute "serious bodily injury" within the scope of the statutory definition of especially aggravated robbery).

12

back.  As the trial court recognized, "[t]here's absolutely nothing . . . that would allow a jury to conclude that this defendant had a [sic] reasonable grounds to fear imminent bodily injury – serious bodily injury or death."[8]

Finally, the defendant relied on the State's mention of self-defense during closing arguments as an indication that even the State believed that the issue of self-defense had been fairly raised by the proof.  We find this speculation unwarranted by the State's assertion to the jury that "this is not a self-defense case" because "[i]f it were a self-defense case, you'd have an instruction on that."  The State's comment could just as easily be viewed as rebuttal to defense counsel's references during opening statement to the defendant's need to defend himself against the victim, including an assertion that the "evidence will show [the victim] was the perpetrator of a violent attack against [the defendant], making him react, making him defend himself."  By the time closing arguments were made, the trial court had already twice refused to charge the jury on self-defense.  The warning for the jury to not consider self-defense could just as easily have been the State's attempt to dispel any notion of self-defense that was mentioned by defense counsel but not fairly raised by the proof.

The trial court correctly concluded that the evidence in this case, when viewed in the light most favorable to the defendant including all reasonable inferences that can be drawn therefrom, does not fairly raise as an issue that the defendant reasonably feared imminent death or serious bodily injury to justify his use of deadly force.  Accordingly, the trial court properly refused to instruct the jury regarding self-defense.  However, we note that even if the trial court had erred in not instructing the jury on self-defense in this case, such an error would have been "harmless beyond a reasonable doubt because no reasonable jury would have accepted the defendant's self-defense theory." *Perrier*, 536 S.W.3d at 404-05.

### III.  CONCLUSION

We hold that the trial court in this case properly exercised its gate-keeping role in refusing to charge the jury on self-defense.  To that end, we reverse the Court of Criminal

---

[8] The defendant contends that the note submitted during deliberations is proof that a juror did want to consider how the evidence applied to the law on self-defense.  As set forth earlier, the question submitted by the jury read: "Is it ever okay to shoot someone in the back in any situation?  Rather it's self-defense, someone breaking in your house, etc."  As noted by the Court of Criminal Appeals, this question is "perplexing."  It is also open to a variety of interpretations.  Regardless, the jury found it unnecessary to wait for the question to be answered before finding the defendant guilty of premeditated murder.  We do not consider the ambiguous question from a juror during deliberations to have any bearing on whether the trial court properly found that the proof had not fairly raised the issue of self-defense.

Appeals and reinstate the judgment of the trial court. It appearing that the defendant Antonio Benson is indigent, the costs of this appeal are taxed to the State of Tennessee.

_____
ROGER A. PAGE, JUSTICE